Lula M. LOCKLEY, Plaintiff,

v.

Elaine L. CHAO, Director, Peace Corps
of the United States, Defendant.

Civ. A. No. 91–1345.

United States District Court,
District of Columbia.

Feb. 4, 1993.

Alan A. Pemberton, Thomasenia P. Duncan, Covington & Burling, Washington, DC.

Claire M. Whitaker, Asst. U.S. Atty., Washington, DC, for U.S.

## MEMORANDUM OPINION

REVERCOMB, District Judge.

This employment discrimination case is before the Court on two motions by the defendant: (1) Defendant's Motion to Dismiss and for Summary Judgment; and (2) Defendant's Motion to Strike Plaintiff's Demand for Compensatory Damages and a Trial by Jury. Both motions have been fully briefed, and oral argument was heard on September 10, 1992.

### Background [1]

The complaint states a cause of action for racial discrimination arising out of a series of events that took place between November 1987 and May 1990. Plaintiff makes claims upon numerous alleged acts of discrimination as well as a claim of retaliation for complaining about discriminatory acts. The facts are set forth very briefly.

Plaintiff is a registered nurse who is black. On November 22, 1987, plaintiff was hired by the Peace Corps as an Occupational Health Nurse in the Office of Medical Services ("OMS") for a thirty-month tour of duty to end May 21, 1990. Plaintiff alleges that subsequent to her hiring, she was not trained as extensively, or by supervisory personnel, as contemporaneously hired white nurses were. Instead, for the first four months of her tour, she was assigned relatively simple tasks usually performed by a part-time employee. Even after assuming the responsibilities normally accompanying the position she held, plaintiff never received adequate training.

Nonetheless, plaintiff performed well in her job, and in April 1989 she received her first evaluation (the "1989 Evaluation"), for the period March 1988 through February 1989, which rated her job performance as "excellent." Despite that high rating, plaintiff alleges that her supervisor, motivated by racial animus, included critical narrative descriptions in the evaluation regarding events that occurred either before the evaluation period had begun or after it had ended. Numerous times during the spring and summer of 1989, plaintiff attempted to discuss the evaluation with her supervisor in order to have the evaluation amended, but she was unsuccessful.

Separately, during this time period, plaintiff was diagnosed with a medical condition that required her to cease travelling—up to then an important aspect of her job—and to limit herself to no more than a forty-hour work week. Plaintiff sought assistance from an Equal Employment Opportunity Commission ("EEOC") counselor to help her negotiate an accommodation in her work schedule necessitated by her condition. This counselling took place during the summer of 1989. No formal complaint was made by plaintiff at that time, although plaintiff alleges that she was told by her EEO counselor that she would likely be retaliated against should she file a complaint of racial discrimination. The EEO counselor denies making any such statement.

Finally, in October 1989, plaintiff complained about the 1989 Evaluation and other acts of racial discrimination to Barbara Zartman, at that time the Peace Corps' Associate Director for Management. At Ms. Zartman's instance, plaintiff's complaint regarding the 1989 Evaluation was investigated, and the evaluation was altered to exclude comments regarding activity not within the review period. Ms. Zartman also referred plaintiff to the EEOC, and plaintiff sought counselling for a second time. Again, however, no formal complaint was brought.

---

1. The facts stated herein "assume the truth of the [plaintiff's] evidence, and draw all justifiable inferences in that party's favor." *Bayer v. United States Dep't of the Treasury,* 956 F.2d 330, 333 (D.C.Cir.1992).

In December 1989, plaintiff was informed that she would not be offered a second thirty-month tour once her current tour ended. Plaintiff alleges that this decision was racially motivated in that no white nurses had been denied a second tour and normal procedures for determining whether a second tour would be offered had not been followed in plaintiff's case. Plaintiff was offered a transfer to the Office of Workers Compensation Program ("OWCP"), which office had an occupational health nurse position opening up in the spring that plaintiff would be allowed to compete for and, thereby, have an opportunity to remain with the Peace Corps for a second tour. Plaintiff accepted the transfer and began working as an occupational health nurse on an interim basis in the OWCP in January 1990.

Three months after transferring to OWCP, plaintiff asked her new supervisor to prepare an evaluation based on plaintiff's three months of work in that office so that plaintiff could include the evaluation in her application for the occupational health nurse position. Plaintiff received her evaluation (the "Interim Evaluation") in April 1990, and as before her work was rated "excellent." Also as before, plaintiff found the narrative portions of her evaluation to be unduly critical and lacking an accurate and complete description of her accomplishments.

Later in April, plaintiff received an evaluation from the OMS (the "1990 Evaluation"), which reviewed her work for the year prior to her transfer. Once again, her work was rated "excellent," but plaintiff alleges that certain critical narrative comments were included in order to discriminate against plaintiff on the basis of her race. When plaintiff complained to Laverne Pierce Webb, the Director of the Office of Volunteer Services, Ms. Webb had the Interim Evaluation stricken because, as an evaluation covering less than 120 days, it did not conform to personnel standards. Ms. Webb approved the 1990 Evaluation, however, finding that it was a fair and accurate description of plaintiff's work.

When the OWCP occupational health nurse position was advertised in late March 1990, applications were restricted to current employees of the Peace Corps. Plaintiff applied for the position, and her application was the only one received. In late April, the position was readvertised for the stated reason that the position had been mistakenly limited to Peace Corps employees only. Following readvertisement, additional applications were received, and the position was awarded to Tommalee Owens, a registered nurse who is black.

In May 1990, plaintiff sought EEO counselling for a third time. This time she followed up her counselling by filing a formal complaint with the EEOC. The EEOC investigated plaintiff's allegations and ultimately concluded against her. She received a "right to sue" letter on May 1, 1991 and filed this action on May 31, 1991. An amended complaint was filed on December 5, 1991.

Plaintiff alleges disparate treatment due to racial discrimination based upon (1) her inadequate training, (2) the 1989 Evaluation, (3) the Interim Evaluation, (4) the 1990 Evaluation, (5) the failure to offer her a second thirty-month tour, and (6) the failure to hire her for the OWCP position. Additionally, plaintiff alleges retaliation in the form of day-to-day harassment as well as adverse employment actions as a result of her complaints to supervisors about racially discriminatory behavior.

### Discussion

#### A. Motion to Dismiss and for Summary Judgment

The standard to be applied in evaluating a motion for summary judgment in a Title VII case was recently restated by the Court of Appeals:

> Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is to be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The district judge, in

ruling on a summary judgment motion, must assume the truth of the nonmovant's evidence, and draw all justifiable inferences in that party's favor.

*Bayer v. United States Dep't of the Treasury,* 956 F.2d 330, 333 (D.C.Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)). Under this standard, the Court must defer to plaintiff's evidence if to do otherwise involves a determination of credibility.

### 1. Timeliness

■ On a procedural level, defendant challenges all of plaintiff's claims except the failure to hire for the OWCP position on the grounds that plaintiff did not seek EEO counselling within the required thirty-day limit following the alleged discriminatory acts. *See* 29 C.F.R. § 1613.214(a)(1)(i). It is undisputed that plaintiff did not seek EEO counselling within thirty days of any of the alleged discriminatory acts except the final failure to hire her for the OWCP position.

Considering the number of times plaintiff sought EEO counselling in this case alone, and plaintiff's prior experience with the EEOC,[2] it seems unlikely that she was unaware of the thirty-day limit. Nonetheless, that is precisely what she alleges in her affidavit. With this in mind, the Court notes that the "thirty-day regulation is not jurisdictional; rather, it is at least as yielding as a statute of limitations that can be tolled for equitable reasons." *Bayer,* 956 F.2d at 332. Where, as here, a plaintiff denies knowledge of the time limit, or alleges that she was warned not to file a formal complaint to avoid retaliation, and construing the facts in the light most favorable for the nonmoving party, a ques-

tion of credibility is presented that is "not susceptible of summary adjudication." *Id.* at 334 (citing cases).[3]

### 2. Disparate Treatment Claims

■ Applying the standard enunciated in *Bayer,* defendant's motion for summary judgment must be denied. Plaintiff has made out a prima facie case as to her claims of disparate treatment regarding the various incidents alleged in the complaint. To establish a prima facie case, plaintiff generally must present evidence that (1) she is a member of a protected class, (2) she was qualified for the position she sought or satisfactorily performed the positions she held, (3) despite her qualifications she was denied a position, or despite her performance she was subjected to adverse employment action, and (4) after she was rejected the position for which she applied remained open, or other employees similarly situated were not subjected to the same adverse employment action. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Valentino v. United States Postal Serv.,* 674 F.2d 56, 63 (D.C.Cir.1982) (quoting *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C.Cir.1981)). Once plaintiff establishes a prima facie case, the employer then may attempt "to articulate some legitimate, nondiscriminatory reason" for the alleged discriminatory act, *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824, following which plaintiff may demonstrate that the employer's stated reasons are mere "pretext." *Id.* at 804, 93 S.Ct. at 1825.

Defendant does not challenge that plaintiff is a member of a protected class or that she was qualified for the position she

---

**2.** Defendant has filed under seal the affidavit of Suzanne H. Elder, Supervisory EEO Specialist, who relates information pertaining to plaintiff's prior experience with the EEOC.

**3.** The Court also takes notice that plaintiff alleges a continuing violation, which would independently establish the timeliness of her claims. *See Shehadeh v. Chesapeake & Potomac Tel. Co.,* 595 F.2d 711, 724–25 (D.C.Cir.1978). Continuing violation claims are easier to prove in disparate effect cases than in disparate treatment

cases, such as this one, because "a series of unrelated and isolated instances of discrimination" against a single plaintiff will not usually amount to a sufficient showing of organized discrimination to justify such a claim. *See Nelson v. Williams,* 25 Fair Empl.Prac.Cas. (BNA) 1214, 1981 WL 27055 (D.D.C. May 5, 1981). Even so, because the Court finds a genuine issue as to plaintiff's knowledge of the thirty-day limit, it will defer resolution of this argument pending a fuller exposition of the facts.

sought or adequately performed the positions she held. Likewise, defendant does not challenge that plaintiff was not offered a second tour, or that her evaluations contain certain critical comments. Rather, defendant argues that plaintiff has failed to present evidence that she was treated differently than similarly situated white nurses. At this stage of the litigation, though, plaintiff has met her burdens as to these counts.

Genuine issues of material fact exist as to the following items: (1) whether, despite the rather chaotic approach to training utilized by the Peace Corps in late 1987, both the quantity and quality of training plaintiff received was inferior to that of a white nurse hired near the time of plaintiff's hiring; (2) whether the various evaluations unfairly portray plaintiff's skills and performance, even accounting for the redaction of certain comments after review by Peace Corps supervisors;[4] (3) whether discrimination played a role in the failure to offer plaintiff a second thirty-month tour, because the decision making process used in her case differed significantly from the process used in making that determination for other nurses, none of whom were denied an opportunity to serve an additional term; and (4) whether the failure to hire plaintiff for the occupational health nurse position resulted from negative performance evaluations based upon racial animus.[5]

In response to plaintiff's evidence, defendant has put forth persuasive evidence of legitimate, nondiscriminatory reasons for its actions—namely, that training at the time of plaintiff's hire was unstructured for all employees, that narrative comments on evaluations tended to include critical remarks for many employees, many of whom are white, and that defendant's refusal to offer a second tour or the OWCP position to plaintiff rested on either plaintiff's inability to fulfill all the duties of the job (e.g., in OMS, due to plaintiff's medical condition) or plaintiff's inferior skills in comparison to the person eventually hired.

Plaintiff, for her part, has presented evidence suggestive of pretext. The Peace Corps apparently was able to train some nurses, but not plaintiff. The negative comments in plaintiff's evaluations may stem from the animosity that seemingly pervaded the relationships between plaintiff and her supervisors. Plaintiff also has presented evidence of pretext in the form departure from normal procedures or peculiar circumstances regarding the failure to offer her a second tour or to hire her for the OWCP position.

### 3. Retaliation Claim

 Plaintiff also has established a prima facie case of retaliation by presenting evidence of an adverse employment action (nonselection for the OWCP position and failure to offer a second tour), following on the heels of statutorily protected activity (plaintiff's complaints alleging racial discrimination to her supervisors and the EEOC), and a plausible argument of a causal connection between the two. *See McKenna v. Weinberger*, 729 F.2d 783, 790 (D.C.Cir.1984).

Defendant argues no causal connection exists, or that even if one does, legitimate, nondiscriminatory reasons exists to justify the Peace Corps' actions. *See id.* Plaintiff has produced sufficient evidence to avoid

---

**4.** Defendant contends that other nurses' evaluations were no better, pointing out that no nurse received a better overall evaluation than "excellent," and that some white nurses received ratings of "satisfactory." But plaintiff's evidence goes to narrative comments, not overall ratings, and plaintiff emphasizes unique treatment accorded her evaluations, such as the inclusion of events in the 1989 Evaluation that occurred before or after that evaluation period.

**5.** Although the position eventually went to another black nurse, Ms. Owens, that fact does not create a *per se* bar to plaintiff's ability to make out a prima facie case. *See, e.g., Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1534 (11th Cir.1984) (concluding that a prima facie case of discrimination is not dependent upon a vacancy being filled by a person not in plaintiff's protected class). For example, plaintiff was not hired for the occupational health nurse position after the position was initially advertised and plaintiff was the only applicant. Thus, it is possible that racial animus played a role in denying the position to plaintiff prior to Ms. Owens' submission of her application.

summary judgment, however. The decision not to offer her a second tour occurred, according to the defendant, in November 1989, one month after plaintiff had complained in writing to Ms. Zartman, the Peace Corps' Associate Director for Management, about what she perceived to be discriminatory treatment. The readvertisement of the OWCP position and the selection of Ms. Owens for that position each occurred only a few days after plaintiff complained about alleged discrimination and an alleged conspiracy to discriminate against her to her supervisor in April and May 1990. The apparent animosity between plaintiff and her supervisors may support a finding that defendant's articulated reasons for its actions were mere pretext.

For all the foregoing reasons, defendant's Motion to Dismiss and for Summary Judgment must be denied.

### B. Motion to Strike Plaintiff's Demand for Compensatory Damages and a Trial by Jury

▓ Plaintiff filed an amended complaint on December 5, 1991, two weeks after the enactment date of the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071 (Nov. 21, 1991). The amended complaint includes demands for compensatory damages and a jury trial, both made available for the first time in Title VII cases by Section 102 of the 1991 Act. *See* 42 U.S.C. § 1981a(a)(1), (c)(1). Defendant has moved to strike those demands on the grounds that the Civil Rights Act of 1991 may not be applied retroactively to cases pending at the time of its enactment.

### 1. Retroactive Application of the 1991 Act

The retroactive application of Section 102 of the 1991 Act remains an area of unsettled law in this Circuit. This Court has issued conflicting opinions on the matter. *Compare Van Meter v. Barr*, 778 F.Supp. 83 (D.D.C.1991) (Gesell, J.) (denying plaintiff's motion to amend complaint to include compensatory damages claim and jury trial demand), *appeal dismissed*, 976 F.2d 1 (D.C.Cir.1992) *with Robinson v. Davis Memorial Goodwill Indus.*, 790 F.Supp. 325 (D.D.C.1992) (Sporkin, J.) (granting plaintiff's motion to amend complaint to include compensatory damages claim and jury trial demand). And though our Court of Appeals has held that the 1991 Act's substantive provisions may not be applied to pre-enactment activity, *Gersman v. Group Health Ass'n, Inc.*, 975 F.2d 886, 900 (D.C.Cir.1992), *petition for cert. filed*, 61 U.S.L.W. 3523 (U.S. Jan. 13, 1993) (No. 92–1190), it "expressly reserved decision on the retroactive application of the Act's provisions for compensatory damages and jury trial." *Sanchez–Baca v. Cavazos*, No. 90–2199, 1992 U.S. Dist. LEXIS 16107, at *3 (D.D.C. Oct. 22, 1992) (Oberdorfer, J.) (concluding that *Gersman* "provides no guidance" as to Section 102); *see Gersman*, 975 F.2d at 899 n. 6.

In *Sanchez–Baca*, Judge Oberdorfer resolved his dilemma by deciding that he would enter judgement based upon his own findings of fact and conclusions of law, but also would convene an advisory jury whose verdict could displace his own "[s]hould it ultimately be determined that plaintiff is entitled to compensatory damages and a jury trial...." 1992 U.S.Dist. LEXIS 16107, at *4. Unfortunately, for present purposes, *Sanchez–Baca* settled and was dismissed on November 10, 1992, leaving unanswered the question that inspired Judge Oberdorfer's contingency.

Judge Oberdorfer's lamentations notwithstanding, it is to *Gersman* that this Court necessarily must turn to seek guidance on the question of whether Section 102 of the 1991 Act may be applied retroactively. The reason lies in the *Gersman* opinion itself. That decision deals with the retroactivity of Section 101 of the 1991 Act, which amended 42 U.S.C. § 1981, and analyzes and attempts to reconcile the two divergent Supreme Court rules regarding retroactive application of new federal laws in the context of the 1991 Act. On one hand, the Supreme Court has set forth "the principle that a court is to apply the law in effect at the time it renders its decision,

unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Bradley v. Richmond Sch. Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). On the other hand, "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988).

In *Robinson*, Judge Sporkin initially avoided the apparent conflict between *Bradley* and *Bowen* by relying upon statutory language in the 1991 Act that supports retroactive application. *See Robinson*, 790 F.Supp. at 326–28.[6] Without delving into that language here, it is sufficient to note that upon its own review of the same statutory language relied upon in *Robinson*, the *Gersman* court concluded that "Congress has not provided a clear expression of its intent as to the retroactive or prospective application of § 101(b) in the language of the statute." *Gersman*, 975 F.2d at 890. Obviously, that conclusion mandates a similar result regarding Section 102. Furthermore, neither *Gersman* nor *Robinson* found the legislative history of the Act to be helpful in the least. *See Gersman*, 975 F.2d at 892, *Robinson*, 790 F.Supp. at 328 n. 3.

As a result, the Court of Appeals found it necessary to reconcile *Bradley* and *Bowen* and "find some principled way to determine which governs the case before us." *Gersman*, 975 F.2d at 896. The solution accomplished at least two important ends. First, language in two earlier Court of Appeals decisions, *Wagner Seed, Inc. v. Bush*, 946 F.2d 918, 924 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1584, 118 L.Ed.2d 304 (1992), and *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958,

964 n. 6 (D.C.Cir.1990), which suggested a strong preference by the Court of Appeals for the *Bowen* doctrine over the *Bradley* doctrine, was identified, labelled, and deemphasized as mere dicta. *See Gersman*, 975 F.2d at 896–97.

Second, relying upon *Bennett v. New Jersey*, 470 U.S. 632, 639, 105 S.Ct. 1555, 1559, 84 L.Ed.2d 572 (1985), which recognized *Bradley* but emphasized "that statutes affecting substantive rights and liabilities are presumed to have only prospective effect," the Court of Appeals set forth a general rule governing retroactive application of congressional enactments:

> The *Bowen* presumption must apply in the case of changes in substantive law. That being said, and *Bradley* still apparently being recognized by the Supreme Court, we agree with the Fifth Circuit that the *Bradley* presumption of applicability of law as of the time of decision must pertain to "remedial provision[s]— not substantive obligations or rights under a statute."

*Gersman*, 975 F.2d at 898–99 (quoting *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1374 (5th Cir.1992), *pet. for cert. filed*, 61 U.S.L.W. 3356 (Sept. 29, 1992)). Applying this rule, the Court of Appeals had no difficulty concluding that the 1991 Act's broadening of the phrase "make and enforce contracts" in 42 U.S.C. § 1981 affected substantive rights and, thus, may be applied only to conduct occurring after the Act's effective date. 975 F.2d at 900.

With the foregoing analysis of *Gersman* in mind, the Court is confident that the *Bradley* presumption of applicability of the law in effect at the time of decision controls this case. This conclusion is consistent with that reached in *Robinson*. Although *Gersman* discredits the statutory analysis in *Robinson*, Judge Sporkin's treatment of *Bradley* and *Bowen* closely

---

**6.** Nonetheless, having found that the plain language of the statute required retroactive application of Section 102, Judge Sporkin went on to defuse the tension between *Bradley* and *Bowen* by formulating a rule very near in effect to that ultimately settled upon in the Court of Appeals:

> This Court reads *Bradley* and *Bowen* to dictate that a presumption of retroactivity is only applicable when a statute does not operate to

deprive a party of a vested or matured right. Because Section 102 does not affect any substantive rights of the Defendants, this Court applies the *Bradley* presumption and finds that even aside from the plain language of the Act, it applies to cases pending at the time of enactment.

*Robinson*, 790 F.Supp. at 329; *see Gersman*, 975 F.2d at 898–99.

parallels that of the Court of Appeals. *See supra* note 6. Moreover, the basis of decision in *Van Meter*, which favors the *Bowen* presumption for Section 102, has been undermined. That case expressly rejected the notion of "dispute based on distinctions between substance and procedure," 778 F.Supp. at 84, the very basis of determination set forth in *Gersman*. Additionally, *Van Meter* relies heavily upon the "dicta" of *ALPO Petfoods* and *Wagner Seed Co.* that the Court of Appeals leaves behind in *Gersman*.

Accordingly, the Court will apply the *Bradley* presumption to the "major, though arguably remedial, changes [of] the right to jury trial and expanded damages under § 102(b) and (c) of the 1991 Act." *Gersman*, 975 F.2d at 899 n. 6. Specifically, this Court agrees with the analysis in *Robinson* that "Section 102 does not affect any substantive rights of the Defendants...." 790 F.Supp. at 329.

### 2. Applying the *Bradley* Presumption

This does not conclude the matter, however. The *Bradley* doctrine is a presumption only, and by its terms does not permit retroactive application of new statutory provisions if to do so would result in "manifest injustice." *Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016. Factors to consider in determining if manifest injustice would occur include "(a) the nature and identity of the parties, (b) the nature of their rights, and (c) the nature of the impact of the change in the law upon those rights." *Id.* at 717, 94 S.Ct. at 2019.

The defendant in the present case, as in *Bradley,* is a governmental organization, not a private party.[7] Therefore, while "[i]t is true that in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by retroactive operation, affect the rights of parties ...," *United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801), *quoted in Bradley,* 416

U.S. at 717, 94 S.Ct. at 2019, the Court is under no such admonition in this case.

Further, the rights at issue here involve "the role of federal law in deciding an issue of great public concern: the procedural rights afforded victims of discrimination." *Kent v. Howard,* 801 F.Supp. 329, 336 (S.D.Cal.1992). Section 102 of the 1991 Act addresses the mechanisms by which victims of discrimination are to be made whole; it enhances the remedial rights of the plaintiff while leaving unchanged the substantive obligation of employers not to discriminate against employees on the basis of race. Section 102 thus deprives no "person of a right that had matured or become unconditional." *Bradley,* 416 U.S. at 720, 94 S.Ct. at 2020.

Finally, the nature of the changes of Section 102 upon existing rights does not create "unanticipated obligations [that] may be imposed upon a party without notice or an opportunity to be heard." *Id.* Indeed, the obligations of employers, the breach of which may incur liability, remain unchanged by Section 102's remedial provisions. As our Court of Appeals has noted:

> Retroactive modifications in remedy ... often do not involve the same degree of unfairness [as retroactive creation of legal responsibilities or abolition of legal rights]. Such modifications do not transform a legal act into an illegal act, or render one responsible to safeguard someone previously thought to act at his peril. Modification of remedy merely adjusts the extent, or method of enforcement, of liability in instances in which the possibility of liability previously was known.

*Hastings v. Earth Satellite Corp.,* 628 F.2d 85, 93 (D.C.Cir.1980), *cert. denied,* 449 U.S. 905, 101 S.Ct. 281, 66 L.Ed.2d 137 (1980).

As in this case, *Hastings* involved the application of the *Bradley* presumption. That case weighed the issue of whether the

---

**7.** The Peace Corps is an independent agency within the executive branch. 22 U.S.C. § 2501-1.

repeal of a ceiling on the District of Columbia's workman's compensation benefits could allow a disabled employee to collect a disability award in excess of the ceiling even though his injuries occurred prior to the repeal. In holding that the repeal may be applied retroactively, the Court of Appeals stated:

> "The existence of a ... ceiling in effect allowed the employer to avoid the responsibility for the full costs associated with his enterprise because it deprived his employees of compensation for earning capacity lost in the employer's service. Removing the artificial ceiling, therefore, creates no injustice. It instead removes an obstacle to fair treatment by 'allocat[ing] to the [employer] an actual, measurable cost of his business.'"

*Id.* at 94 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 19, 96 S.Ct. 2882, 2894, 49 L.Ed.2d 752 (1976)). Similarly, Section 102 of the 1991 Act simply allows the plaintiff to receive an award, should the employer ultimately be found liable by a jury for acts of racial discrimination, that more accurately reflects the harms wrought be the wrongful conduct.

The preceding *Bradley* analysis notwithstanding, some courts have held that retroactive allowance for compensatory damages could, in fact, work a manifest injustice. *See Landgraf v. USI Film Prod.*, 968 F.2d 427, 433 (5th Cir.1992) (holding in suit between private parties [8] that retroactive application of 1991 Act's provisions for compensatory and punitive damages would work a manifest injustice), *cert. granted,* ___ U.S. ___, 113 S.Ct. 1250, 122 L.Ed.2d 649 (1993); *Letourneau v. Casa Mia, Inc.*, 804 F.Supp. 389, 392–93 (D.Me.1992) (same); *Crumley v. Delaware State College*, 797 F.Supp. 341, 352 (D.Del.1992) (same). *But see Kent*, 801 F.Supp. at 336 (holding in suit against federal employees that retroactive application of 1991 Act's provisions for jury trial and compensatory damages causes no manifest injustice); *Bridges v. Eastman Kodak Co.*, 800 F.Supp. 1172, 1178 (S.D.N.Y.1992) (holding no manifest injustice, in suit between private parties, and including claim for punitive damages); *Jaekel v. Equifax Mktg. Decision Sys., Inc.*, 797 F.Supp. 486, 493–94 (E.D.Va.1992) (same); *Tyler v. Pennsylvania*, 793 F.Supp. 98, 101–02 (M.D.Pa. 1992) (holding no manifest injustice, in suit against state government).

For instance, in *Landgraf*, the Fifth Circuit argues:

> Retroactive application of this provision [regarding compensatory and punitive damages] to conduct occurring before the Act would result in a manifest injustice. The addition of compensatory and punitive damages to the remedies available to a prevailing Title VII plaintiff does not change the scope of the statute's coverage. That does not mean, however, that these are inconsequential changes in the Act. As Judge Posner notes in *Luddington* [*v. Indiana Bell Tel. Co.*, 966 F.2d 225, 229 (7th Cir.1992), *petition for cert. filed*, 61 U.S.L.W. 3446 (U.S. Dec. 3, 1992) (No. 92–977) ], "such changes can have as profound an impact on behavior outside the courtroom as avowedly substantive changes."

968 F.2d at 433. The reasoning behind this statement was laid out by Judge Posner in *Luddington:* "The amount of care that individuals and firms take to avoid subjecting themselves to liability whether civil or criminal is a function of the severity of the sanction...." 966 F.2d at 229. Judge Posner makes essentially an economic argument based on the premise that potential future costs control present conduct, and retroactive application of the 1991 Act's damages section unfairly alter the costs to employers after decisions about conduct have already been made and executed. This argument was stated more bluntly in *Crumley:*

> Because of the potential for lawsuits, decisions to downsize or to terminate employees often include a calculus of exposure to damages in civil suits. For this reason it can be persuasively argued that it is unreasonable to expect defendants

---

**8.** Section 102 of the 1991 Act does not allow recovery of punitive damages against "a government, government agency or political subdivision." 42 U.S.C. § 1981a(b)(1).

to pay damages that were not calculated into their decisions.

797 F.Supp. at 352.

As persuasive as the reasoning in *Landgraf, Luddington,* and *Crumley* is in the context of private employers, it must be plainly distinguished from this case, which involves a suit against an independent agency of the United States. First, any "calculus of exposure" in this case is affected less significantly than in those cases because the government is protected against punitive damages by the 1991 Act. *See* 42 U.S.C. § 1981a(b)(1). Secondly, and fundamentally, the government is not a private individual, and principles of fairness that require notice and a right to be heard before subjecting private parties to retroactive liability do not obtain against the government. That is the clear import of Supreme Court rulings regarding retroactivity dating to the inception of this nation. *See, e.g., Bradley,* 416 U.S. at 724, 94 S.Ct. at 2022 (allowing retroactive award of attorney's fees in case against local school district); *Schooner Peggy,* 5 U.S. (1 Cranch) at 110, 2 L.Ed. 49 (urging no retroactive application of laws in cases between *private* parties).

Hence, the arguments that compel a finding of manifest injustice in suits between private litigants do not apply to the present case, and the preceding analysis of *Bradley* factors remains firm. As this case involves procedural and remedial changes in the law, *Gersman* dictates that the *Bradley* presumption in favor of retroactive application applies, and because the Court finds that no manifest injustice will occur, the *Bradley* presumption is controlling. Accordingly, defendants Motion to Strike Plaintiff's Demand for Compensatory Damages and a Trial by Jury must be denied.