**Archibald HILL, Plaintiff,**

**v.**

**NEW YORK CITY BOARD OF EDUCATION, Bureau of Pupil Transportation, and Amboy Bus Company, Inc., Defendants.**

**No. CV-87-3008.**

United States District Court, E.D. New York.

Nov. 12, 1992.

Christopher R. Alger, Shearman & Sterling, New York City, for plaintiff.

Geoffrey A. Mort, Asst. Corp. Counsel, Law Dept., New York City, for Board of Educ.

Silverman, Collura & Churnis, New York City, for Amboy Bus Co., Inc.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff in this action, Archibald Hill, alleges employment discrimination and other violations of his federal civil rights. The defendants are the New York City Board of Education and a private bus company. Both defendants have moved for summary judgment on all causes of action, and plaintiff has cross-moved for partial summary judgment. For the reasons set forth below, defendants' motions are granted in part and denied in part, and plaintiff's motion is denied in full.

## FACTS

The facts material to the disposition of these motions for summary judgment are not entirely undisputed. Plaintiff Hill is a black man of Jamaican origin. From March of 1980 until June 24, 1985, Hill was employed as a bus driver by defendant Amboy Bus Co., Inc. ("Amboy"). During that time, plaintiff also was certified by defendant New York City Board of Education (the "Board of Education" or the "Board"), Office of Pupil Transportation ("OPT"), to drive buses for children enrolled in New York City public schools. As a prerequisite for certification, the Board required plaintiff to complete a 20-hour training course—a requirement he had satisfied during previous employment—as well as periodic "refresher" courses. (Board's Rule 3(g) Statement in Support ¶ 2)

During the period relevant to this action, the only transportation services provided by defendant Amboy were those pursuant to a contract with the Board of Education. Among other provisions, that contract stated that:

> [I]f the Director [of the OPT] determines that an operator's competency falls below acceptable standards, ... the contractor, upon receiving written notice from the Director to that effect, shall not again employ this operator on any part of the work to be performed hereunder, or on any part of any work the contractor may perform for the Board of Education under any other contract.

(Exh. "D" of Defendant Amboy) Notwithstanding this contractual provision, Amboy retained sole power to hire and to terminate its employees; Amboy was also solely responsible for determinations regarding schedules, compensation, benefits, and work conditions of its employees. (Affidavit of Richard Langford ¶¶ 4–5) The Board simply reserved the right to decertify drivers and thereby bar them from working under transportation contracts executed between the Board and Amboy. (*Id.* ¶ 3)

In September of 1984, Amboy assigned plaintiff to a route that required him to transport "special needs" students to Public School 396 ("P.S. 396") in Brooklyn, New York. In preparation for this new assignment, plaintiff had to complete a one-hour training course concerning the transportation of special needs students. In addition, Board regulations required the presence of an OPT-certified "escort" or "matron" to work with the driver on routes that involved transporting these students. The scope of the escorts' duties—particularly as to whether they act under the direct authority of the driver—is a matter of dispute between the parties. In any event, Esperanza Torres, an Hispanic woman, was the escort from September of 1984 until February of 1985 on the bus route assigned to plaintiff Hill.

From the beginning of Hill's term on this route, one mentally handicapped student, 21–year–old Cecil Brimmage, proved exceptionally disruptive and violent: while riding the bus driven by plaintiff, Brimmage would hit his hands and head against the windows of the bus; he also would hit other students. For this reason, plaintiff and the escort began to restrain Brimmage by binding his hands together at the start of each morning's ride and would untie him on arrival at P.S. 396. Plaintiff maintains that escort Torres "initiated" this practice of binding Brimmage when she brought a segment of clothesline from her home and tied his hands together. Torres initially testified that she had secured permission from an employee of the Catholic Guardian Society Group Home (the "Group Home"—Cecil Brimmage's residence) to do "the best she could" to handle Brimmage. Nonetheless, Torres now insists—as adamantly as plaintiff denies—that she began to tie Cecil Brimmage's hands only upon direct instruction from plaintiff to do so.

In February of 1985, Helen Collura, a white woman, replaced Torres as the escort on the plaintiff's bus. She too would tie Cecil Brimmage's hands together at the start of each morning; she too maintains that she did so only at plaintiff's direction. Neither the escorts nor plaintiff ever filed a written report concerning the problems they experienced in transporting Brimmage from the Group Home to P.S. 396; none of the three ever secured authorization from any representative of the OPT or Amboy to restrain the student in this manner.

On the morning of May 13, 1985, an escort who was substituting for Collura did not restrain Brimmage. Indeed, plaintiff himself states that this replacement escort "refused" to bind Brimmage. (Plaintiff's Rule 3(g) Statement in Support ¶ 14) Therefore, plaintiff undertook to tie Brimmage's hands—the sole occasion, he claims, on which he himself bound the student. When plaintiff arrived at P.S. 396, a school employee witnessed plaintiff untie Brimmage and informed the P.S. 396 principal who immediately complained of plaintiff's behavior to OPT. That same day, Amboy initiated a preliminary investigation into allegations of improper conduct by plaintiff and the escorts with respect to Cecil Brimmage. Two days later, Amboy held a hearing at which it decided to suspend plaintiff, Torres, and Collura without pay. After the suspensions, all three were reassigned to new routes. Amboy contends that, "[p]rior to and after its hearing, Amboy had no conversations or discussions with any Board of Education or OPT official regarding the charges against Hill and the escorts." (Amboy's Rule 3(g) Statement in Opposition ¶ 8)

In early June of 1985, the OPT sent a letter to plaintiff dated June 5, 1985 advising him that the OPT had "scheduled a conference ... regarding a complaint relating to your conduct as a school bus driver/escort." (Exh. "O" of Defendant Board) This letter further advised plaintiff

that he was "entitled to be represented by counsel, and offer evidence on [his] own behalf." Plaintiff does not dispute that he received this notification, but he does claim that he never received the second page of this letter—a page dated June 6, 1985 and typewritten on a machine different from the machine on which the first page was typewritten. That second page, which the defendant Board insists was sent, advised plaintiff of the specific charge pending against him:

> It has been alleged that on May 13, 1985, on the trip to school, witnesses saw Mr. Hill untie the hands of Cecil Brimmage who attends special education classes at PS 396 Brooklyn.
>
> The student in question was injured to such a degree that rope burns were visible on his hands, this was verified by the teacher in charge the same morning.

On June 20, 1985, the OPT conducted its hearing with respect to the incident of May 13, 1985. Plaintiff was present with a union representative, and he testified when examined by members of the OPT. However, plaintiff did not present any evidence on his own behalf. Further, even though defendants eagerly point out that plaintiff did not cross-examine any of the witnesses against him, the record does not indicate clearly that any such witnesses attended this hearing. That is, although the record notes the appearances of Michael Gatto on behalf of Amboy, Ronni Michelson on behalf of Catholic Guardian Society, and Joan Roberson on behalf of "BBDSO" (an organization not identified in the papers of the parties)—and although the record reflects that Gatto and Michelson answered questions from the panel members of the OPT—the record does not disclose that these persons were ever sworn as witnesses. (Exh. "P" of Defendant Board) Nor does the record indicate any time at which the panel members—who nominally conducted the hearing—advised plaintiff that he could question Gatto or Michelson. And yet, no other witnesses were called by the OPT during this part of the hearing.

Indeed, on this last point there is further ambiguity. The parties' submissions do not indicate whether the June 20, 1985 proceedings constituted only one hearing (concerning the plaintiff's conduct) or two hearings (concerning, as well, the conduct of escort Collura). Both parties agree that at that hearing plaintiff: testified about his own behavior; presented no evidence on his own behalf; and was excused from the hearing before Collura was called to testify. But it was during Collura's testimony that she insisted she had bound Brimmage only on plaintiff's instructions. Defendant Board of Education contends that plaintiff was dismissed from the hearing before Collura testified because her testimony was part of a "second" hearing—that is, an inquiry into her own conduct. Accordingly, the OPT argues that plaintiff should have been present at this "second" hearing only if he were called as a witness by one of the parties. And yet, the transcript of the "two" hearings curiously resembles the transcript of a single, integrated hearing, as an OPT panel member in essence conceded during the course of his deposition testimony. (See Exh. "A" of Plaintiff at 203)

On June 24, 1985, Director of the OPT, Gregory Kaladjian, advised Amboy by letter that the Board had decided to decertify plaintiff; [1] Amboy advised plaintiff that he had been decertified and immediately thereafter terminated his employment. As to the two escorts, however, the OPT decided that they should be required to take the Escort Basic Training Program for a second time.[2] Neither escort was fired.

On March 5, 1986, plaintiff filed a complaint with the Equal Employment Oppor-

1. The Board concedes that its ordinary practice is to notify both the driver and his employer that the driver's certification has been withdrawn. Despite plaintiff's assertion that he never received notice of his decertification from the OPT and despite OPT's inability to locate a copy of such notice to plaintiff, the Board contends that plaintiff was "in all likelihood" sent such a letter. (Defendant Board's Rule 3(g) Statement in Opposition ¶ 7)

2. The OPT held a hearing concerning Torres' behavior with respect to Cecil Brimmage on October 15, 1985. Plaintiff was not present at that hearing.

tunity Commission ("EEOC"); he was issued a right-to-sue letter on June 30, 1987. In the interim, the OPT issued a written opinion on June 11, 1986 concerning plaintiff, Torres, and Collura. Noting the testimony by both escorts—Collura on June 20, 1985 and Torres on October 15, 1985—that plaintiff had initiated the practice of binding Brimmage, the OPT found that plaintiff in fact had instructed the escorts to restrain Brimmage in this fashion. Furthermore, the OPT reiterated its position that a certified driver of a bus on an OPT route has final responsibility for everyone on the bus and that the escorts work under the driver's supervision. The OPT concluded that plaintiff deserved to be treated more harshly than the escorts because of his supervisory position and because of his directions to them to engage in the daily restraint of the student. In its submissions for this motion, the Board maintains that, notwithstanding reference in this OPT decision to documents not presented during the June 20, 1985 hearing, the decision to decertify the plaintiff rested entirely on testimony before the OPT at the proceedings of June 20, 1985. (Defendant Board's Rule 3(g) Statement in Opposition ¶ 9)

Finally, after receipt of his EEOC right-to-sue letter, plaintiff timely instituted this action against the Board (through the OPT) and against Amboy. He states as his five causes of action: (1) that defendants [3] discriminated against plaintiff by terminating him on the bases of race, sex, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; (2) that defendants deprived plaintiff of his livelihood and property without due process of law in violation of 42 U.S.C. § 1983; (3) that defendants conspired to deprive plaintiff of his livelihood and property without due process of law in violation of 42 U.S.C. § 1985(3); (4) that defendants intentionally discriminated against him in violation of 42 U.S.C. §§ 1981 and 1983; and (5) that defendants conspired to discriminate intentionally against him in violation of 42 U.S.C. § 1985(3). Defendants have moved for summary judgment on all causes of action; plaintiff has cross-moved for summary judgment on the first and the second causes of action.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) provides in relevant part that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, Rule 56(c) sets forth as clear prerequisites for summary judgment: first, the absence of dispute as to any material fact; *and,* second, entitlement to judgment as a matter of law.

█ The Supreme Court has established a clear test for whether an issue of fact is "genuine" for the purposes of summary judgment. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), the Court stated that a "dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Thus, "if the evidence is merely colorable ... or is not significantly probative, ... summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511. However, the existence of such a genuine issue of fact does not in itself defeat a motion for summary judgment; rather, the issue must be of a *material* fact. As the Court further stated in *Anderson:* "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510. Thus, in order to evaluate the materiality of any disputed facts, this court must examine the substantive law underlying plaintiff's causes of action; it is only with reference to those governing standards that this court may determine

3. In fact, the amended complaint refers only to the "defendant" in this first cause of action; however, all parties have proceeded as though this allegation were made against both defendants, and this court will defer to their construction of the complaint on this point.

whether or not the entry of summary judgment is appropriate.

Finally, in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. And, insofar as granting a motion for summary judgment "deprives a party of its day in court and the right to present its cause to a jury, the district court in examining the record must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Gibson v. American Broadcasting Cos., Inc.*, 892 F.2d 1128, 1132 (2d Cir.1989).

## I. TITLE VII: DEFENDANTS BOARD AND AMBOY

Title VII of the Civil Rights Act of 1964 prohibits discriminatory employment practices. Specifically, 42 U.S.C. § 2000e–2(a)(1) provides, in relevant part, that:

> It shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, ... sex, or national origin....

In this case, plaintiff alleges that both the Board and Amboy did so discriminate against him on these impermissible bases: the Board decertified him and Amboy discharged him because he is a black, Jamaican-born male. As a threshold matter, the Board urges that it is not subject to the provisions of Title VII since it was not the "employer" of plaintiff as that word is used in Section 2000e–2(a)(1); rather, the Board contends that it merely "licensed" or certified plaintiff to perform work for his employer, Amboy, under contracts between Amboy and the Board.[4] Accordingly, before addressing the possible liability of both defendants under Title VII, this court will respond to the Board's argument that Title VII does not apply to it at all.

### 1. *The Board as "Employer":*

For purposes of Title VII, "employer" is defined—with "magnificent circularity", *Broussard v. L.H. Bossier, Inc.*, 789 F.2d 1158, 1160 (5th Cir.1986)—by 42 U.S.C. § 2000e(b) as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year...." This "definition"—in effect, that an employer is one who employs employees—begs for a clarifying construction by the courts.

Plaintiff would not have the court look very far. He points out that Section 2000e(a) defines "person" to include "governmental agencies" such as the Board of Education. He then argues that since the Board had "fifteen or more employees for each working day in each of twenty or more calendar weeks in" the relevant year, the Board constituted an "employer" under Title VII. Plaintiff thus entirely sidesteps the question of whether the Board was or was not *his* employer; he apparently considers dispositive the fact that the Board is the employer of *somebody*—whomever that person may be. (*See* Memorandum of Plaintiff in Opposition at 40 stating "The statute thus protects not only an employer's employees, but 'any individual' against whom an employer wrongfully discriminates.") However, this argument ignores the fundamental predicate for Title VII liability—the existence of an *employment* relationship between the one who discriminates against another and that other who finds himself the victim of that discrimination. This court declines to follow plaintiff's interpretation of this provision.

Rather, defendant Board is correct to point out that courts have wrestled with the test for determining employer status under Title VII. Indeed, this problem has proven most difficult in the context of distinguishing between employers and inde-

4. The defendant Amboy does not dispute that, as plaintiff's employer, it is subject to Title VII in this action.

pendent contractors. As the Fifth Circuit has observed:

> Three tests have been devised by the courts to unravel the employee/independent contractor conundrum. The first is the traditional common law test of agency, turning on the employer's right to control. This test was replaced in Fair Labor Standards Act cases by an " 'economic realities' test under which persons are considered employees if they, 'as a matter of economic reality, are dependent upon the business to which they render service.' " *Hickey v. Arkla Industries, Inc.*, 699 F.2d 748, 751 (5th Cir.1983) (*citing Mednick v. Albert Enterprises, Inc.*, 508 F.2d 297 (5th Cir. 1975), *quoting Bartels v. Birmingham*, 332 U.S. 126, 130 [67 S.Ct. 1547, 1550, 91 L.Ed. 1947] ... (1947)). The third test is a hybrid which considers the "economic realities" of the work relationship as an important factor in the calculus, but which focuses more on "the extent of the employer's right to control the 'means and manner' of the worker's performance...." *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C.Cir.1979) (Title VII case).

*Mares v. Marsh*, 777 F.2d 1066, 1067 (5th Cir.1985) (footnotes omitted). The Board suggests that the "hybrid" test adopted in *Spirides v. Reinhardt*, 613 F.2d 826 (D.C.Cir.1979), is the test that courts "[t]o an increasing extent" have used in the context of Title VII.[5] (Defendant Board's Reply Memorandum at 16) As such, the Board urges this court to apply the hybrid test to determine whether the Board was an "employer" of plaintiff at the time he was decertified.

However, Second Circuit case law does not support such clear adherence to the "hybrid" test. In *Spirt v. Teachers Insurance & Annuity Association*, 691 F.2d 1054, 1063 (2d Cir.1982), *vacated*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), *on remand*, 735 F.2d 23 (2d Cir.), *cert. denied*, 469 U.S. 881, 105 S.Ct. 247, 83 L.Ed.2d 185 (1984), a case decided after *Spirides*, the Second Circuit employed the broader "economic realities" test mentioned above and described in greater detail below. And in *Hyland v. New Haven Radiology Assoc., P.C.*, 794 F.2d 793 (2d Cir. 1986), the court referred to the *Spirides* hybrid test without commenting on how that case applies to actions in its circuit. *Id.* at 797 ("A 'hybrid' economic realities/right to control test has been introduced to determine whether one claiming the benefits of the ADEA is an employee or an independent contractor."). The lower courts within the Second Circuit have applied both the broad test of *Spirt* and the narrower test of *Spirides*. *Compare United States v. Yonkers*, 592 F.Supp. 570, 590 (S.D.N.Y.1984) (quoting *Spirt*) *with Tadros v. Coleman*, 717 F.Supp. 996, 1004 (S.D.N.Y.1989) (hybrid test is "[t]he better approach"), *aff'd*, 898 F.2d 10 (2d Cir.), *cert. denied*, 498 U.S. 869, 111 S.Ct. 186, 112 L.Ed.2d 149 (1990). Contrary to the Board's representation, then, the Second Circuit has not established the "hybrid" test as the law for determining employer status under Title VII.

Without a clear authoritative adoption of the *Spirides* hybrid approach, this court cannot overlook the broader test that the Second Circuit unambiguously endorsed in *Spirt*. There, the court considered whether a retirement association was a Title VII employer of a college instructor formally employed by a university:

> [I]t is generally recognized that "the term 'employer,' as it is used in Title VII, is sufficiently broad to encompass any party who significantly affects access of any individual to employment opportunities, regardless of whether that party may technically be described as an 'employer' of an aggrieved individual as that

5. The Fair Labor Standards Act of 1938 ("FLSA"), Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act ("ADEA") provide similar definitions for "employer" and "employee." Thus, "[s]ince all three statutes have a similar purpose—to stamp-out discrimination in various forms—cases construing the definitional provisions of one are persuasive authority when interpreting the others." *Hyland v. New Haven Radiology Assoc., P.C.*, 794 F.2d 793, 796 (2d Cir.1986).

term has generally been defined at common law."

*Spirt,* 691 F.2d at 1063 (quoting *Vanguard Justice Society, Inc. v. Hughes,* 471 F.Supp. 670, 696 (D.Md.1979)). The defendant has not cited any subsequent decision that disavows or otherwise restricts this language.

Under *Spirt,* it is clear that the Board of Education was a Title VII "employer" in this case. The Board had the exclusive power to certify plaintiff to drive on Board of Education routes, and, because Amboy did business only with the Board, such certification power was tantamount to a "veto" power by the Board over plaintiff's employment. Further, the Board does not dispute that its regulations and policies constituted a substantial segment of the parameters of permissible conduct by plaintiff in the discharge of his duties for Amboy; as such, the Board indirectly exercised significant control over plaintiff's work.[6] Finally, the facts of this case clearly indicate that the Board—not Amboy—ultimately determined whether plaintiff's transgression of those regulations should affect his employment: Amboy, after conducting its own investigation into plaintiff's conduct, placed plaintiff on suspension; by the time the Board decided to decertify plaintiff, the bus company had reassigned plaintiff to drive on new routes. Only after plaintiff's decertification—indeed, on the day that Amboy learned of his decertification—did Amboy terminate plaintiff's employment. On these facts, this court concludes that the Board "significantly affect[ed] access of [the plaintiff] to employment opportunities...." As such, the Board constituted an "employer" of the plaintiff for Title VII purposes. With this threshold question answered, this court turns to the merits of plaintiff's Title VII claim.

2. *Title VII Liability on the Merits*

The Supreme Court set forth the "basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment" in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." ... Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Id.* at 252–53, 101 S.Ct. at 1093 (quoting *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973)). Furthermore, to establish this prima facie case of "discrimination in firing in violation of ... Title VII," plaintiff must show that he "belongs to a protected class," that he was qualified for his position, that he was discharged, and that the discharge "occurred 'in circumstances giving rise to an inference of racial discrimination.'" *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir. 1989) (quoting *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987)). Nonetheless, the burden on plaintiff of establishing this prima facie case of discrimination is "de minimis." *Meiri v. Dacon,* 759 F.2d 989, 996 n. 10 (2d Cir.) (citing *Sweeney v. Research Foundation of the State University of New York,* 711 F.2d 1179, 1184 (2d Cir.1983)), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

Although defendants concede that plaintiff belongs to a protected class, that he was qualified for his position as a bus driver, and that he was discharged, they argue that the discharge did not occur "in

6. Although control over the work conditions of the individual is a significant factor in the "hybrid" test, it is also relevant to the "economic realities" test in that the power to determine the rules of conduct for employees—and the power to adjudicate alleged infractions of those rules—is an element of the power to affect access to employment opportunities.

circumstances giving rise to an inference of racial discrimination." Defendants argue that plaintiff has failed to establish that he was treated dissimilarly from those with whom he was similarly situated. (Defendant Board's Memorandum in Support at 23) Initially, defendants argue that bus drivers enjoy supervisory positions over the escorts. From this assertion, they reason that plaintiff—who complains that he was decertified and discharged with respect to conduct for which two non-black escorts were simply suspended—was not "similarly situated" to the escorts. "Employees who are dissimilar," the defendants urge, "need not be treated identically." *Fitch v. R.J. Reynolds Tobacco Co.,* 675 F.Supp. 133, 137 (S.D.N.Y.1987).

However, in the context of alleged discrimination in the course of disciplinary discharge, the question of whether plaintiff had similar job responsibilities is not relevant to resolving whether plaintiff has proven a prima facie case of discrimination. Rather:

> What *is* relevant is that two employees are involved in or accused of the same offense and are disciplined in different ways. Differences in job status and skill may well have an impact on the second phase of proof under *McDonnell–Douglas,* in which the employer must prove a legitimate and nondiscriminatory reason for the differing treatment, but they should not defeat a prima facie case....

*Rohde v. K.O. Steel Castings, Inc.,* 649 F.2d 317, 322 (5th Cir.1981). Thus, this court must consider whether the fact that the escorts and plaintiff received dissimilar discipline for their conduct raises an inference of discrimination. Again, however, because plaintiff bears an insubstantial burden of proof as to his prima facie case, he need show only that the disparate discipline took place under " '*apparently* similar circumstances.' " *Rohde,* 649 F.2d at 322 (quoting *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1255 (5th Cir.1977)) (emphasis added).

On the facts as presented by the parties, it is clear that plaintiff has set out a prima facie case of discrimination. Plaintiff, a black, was involved in "apparently similar" conduct as were a white escort and an Hispanic escort. Plaintiff was decertified by one defendant and fired by the other; the escorts were disciplined far less harshly. As to these material facts, there is no genuine issue.

However, a significant factual dispute exists as to whether the Board's and Amboy's articulated reasons for plaintiff's decertification and subsequent termination of the plaintiff are pretextual. Here, the Board and Amboy argue that plaintiff legitimately deserved harsher treatment than the escorts because he exercised supervisory powers over them. Defendants identify this difference in status and responsibility as a "legitimate, nondiscriminatory reason" for the disparate treatment. As indicated above, however, the professional relationship between a school bus driver and an escort is the object of vigorous dispute: plaintiff insists that drivers do not exercise any supervisory authority over the escorts. None of the parties has demonstrated that this dispute is anything other than genuine. Moreover, under *Rohde,* questions of relative authority and relative job status are material to the Title VII inquiry involved here. Defendants' argument that plaintiff was treated more harshly because he engaged in different conduct than that of the escorts—that is, that plaintiff *instructed* the escorts to bind Cecil Brimmage but that the escorts simply exercised poor judgment in following those orders (Defendant Board's Memorandum in Opposition at 8)—relates closely to defendants' position that plaintiff exercised supervisory authority over the escorts. The evidence on these points is such that a reasonable jury could find either account of the relevant events to be true. But, in the posture of a summary judgment motion, the trial court "cannot try [such] issues of fact; it can only determine whether there are issues to be tried." *Heyman v. Commerce & Industry Insurance Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975).

In sum, because plaintiff has established a prima facie case of discrimination and because there remain genuine issues of ma-

terial fact as to whether defendants' reasons for their actions are pretextual, this court cannot at this time grant summary judgment for any party on plaintiff's first cause of action.

## II. CUSTOM OR POLICY: THE BOARD OF EDUCATION

The second, third, fourth, and fifth causes of action against the Board allege violations of plaintiff's civil rights under 42 U.S.C. §§ 1981, 1983, and 1985(3). However, in these causes of action, plaintiff has elected not to sue the Board officials who were the agents of these alleged violations; rather, he has sued the Board itself. Since the Board is an arm of a municipality—that is, an arm of the City of New York—plaintiff must set forth evidence that these alleged violations of his federal rights were effected pursuant to an official custom or policy of the Board. Because plaintiff has failed in this showing, summary judgment must be entered for the Board on these claims.

Section 1983 of Title 42 of the United States Code provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

In his second cause of action, plaintiff alleges that defendants violated Section 1983 "by depriving him of his livelihood and his property without due process of law." (Amended Complaint ¶ 38) More specifically, plaintiff alleges that the OPT hearing held to determine whether his certification as a bus driver should be withdrawn was constitutionally deficient in several respects: he was not provided adequate notice before the hearing regarding charges against him; he was not given an opportunity to present evidence on his own behalf; and he was not given an opportunity to cross-examine the witnesses who appeared against him. These procedural deficiencies, plaintiff states, deprived him of his right to due process of law under the fourteenth amendment to the Constitution.

Plaintiff's fourth cause of action arises under Section 1981. That section provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Here, plaintiff alleges that the Board "intentionally discriminated against Plaintiff on the basis of his race, sex and national origin, in violation of ... [Sections] 1981 and 1983." (Complaint ¶ 42) Specifically, plaintiff alleges that the Board decertified him on the bases of his race, sex, and national origin.

Finally, as to the third and the fifth causes of action, plaintiff alleges that the Board "conspired" with defendant Amboy to execute the violations of federal rights that are alleged in the second and the fourth causes of action. Section 1985(3) provides that "[i]f two or more persons in any State ... conspire ... for the purpose of depriving ... any person" of his federal rights, that person so deprived shall have a cause of action against the conspirators. Thus, on plaintiff's theory of liability, the Board of Education is a "person" who conspired with Amboy (a second "person") in order to deprive Hill of his rights under Sections 1981 and 1983.

The Board is not liable for the actions of its employees on a simple theory of respondeat superior. *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978) (municipality liable on Section 1983 claim only "when execution of a government's policy or custom ... inflicts the injury"). Rather, plaintiff may prevail on his Sections 1981, 1983, and 1985(3) claims against the Board of Education only if he can establish that

the alleged denials of his federal rights derived from an "official policy or custom" of the Board. "Aware that governmental bodies can act only through natural persons," the Supreme Court determined that local governments "should be held responsible when, and only when, their official policies cause their employees to violate another's constitutional rights." *St. Louis v. Praprotnik,* 485 U.S. 112, 122, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988); *see also Jett v. Dallas Independent School District,* 491 U.S. 701, 735–36, 109 S.Ct. 2702, 2722, 105 L.Ed.2d 598 (1989) ("custom or policy" requirement for municipal liability under Section 1983 equally applicable to Section 1981 claims); *Owens v. Haas,* 601 F.2d 1242, 1247 (2d Cir.) (municipal liability under Section 1985(3) must be predicated on "official custom or policy" of municipality), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979). In this case, plaintiff does not contend that the constitutional harms inflicted on him were the products of an officially articulated policy. He does not allege that the constitutional harms of which he complains were ever directed at anyone other than himself. In short, plaintiff does not allege that his treatment by the Board resulted from a policy or custom.

Nonetheless, plaintiff may still prevail under Sections 1981, 1983, and 1985(3) if municipal liability is predicated on "a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924. That is, the decisions made by Gregory Kaladjian and his associates as to plaintiff may constitute an "official policy or custom" of the Board if these decisionmakers possessed authority to make final decisions of policy in the applicable area. *Id.* at 127, 108 S.Ct. at 926. If, however, these decisions were made pursuant to authority delegated by higher policymakers, the acts of Kaladjian and others do not subject the Board to liability under Sections 1981, 1983, and 1985(3). *Id.*

In this case, Gregory Kaladjian—the Director of the Office of Pupil Transportation—and the other members of the OPT who participated in the decertification hearings did not have "final policymaking authority." Kaladjian had the delegated authority to make individual decertification decisions. (Aff. of Kevin Gill ¶ 3) However, he was empowered to act only within the parameters of certain policies set by the Chancellor of the Board of Education and by the Board itself. Those higher authorities retained the authority to overrule Kaladjian on appeal. (*Id.* ¶ 7) As such, his decisions on matters of decertification do not constitute the official policy or custom of the Board of Education. Indeed, this case parallels almost precisely a hypothetical illustration posed by the Supreme Court in *Pembaur v. Cincinnati,* 475 U.S. 469, 483 n. 12, 106 S.Ct. 1292, 1300 n. 12, 89 L.Ed.2d 452 (1986):

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability.

Here, Kaladjian did have discretion to decertify drivers, but he did not have the authority to establish policies relating to such decertifications. He was not, then, the final policymaker, and his discretionary decisions do not engender liability on the part of the Board of Education.

Plaintiff offers no proof that Kaladjian—or anyone else directly connected with his case—had final authority to determine policy with respect to the procedures of decertification hearings or with respect to the decertification decision itself. That is, of all the people employed by the Board of Education whom the plaintiff alleges to be constitutional tortfeasors, he does not identify even one as a policymaker within the meaning of *Praprotnik.* Rather, he argues that "Kaladjian made the [decertification] decision and enforced it, plain and simple." (Plaintiff's Memorandum in Op-

position at 7) However, this "plain and simple" theory is nothing more than the theory of respondeat superior that the Supreme Court rejected—plainly and simply—in *Monell.* In sum, then, this court must grant summary judgment in favor of the Board of Education on plaintiff's second, third, fourth, and fifth causes of action.

### III. STATE ACTION: DEFENDANT AMBOY

■ Plaintiff's second cause of action also seeks relief against defendant Amboy for alleged violations of Section 1983 in the conduct of plaintiff's decertification hearing. Amboy argues that it cannot be held liable under Section 1983 because, as a private party, it did not act "under color of state law." The principle to which Amboy refers was set forth by the Supreme Court in *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982):

> Our cases have ... insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.... First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.

Thus, it is clear that plaintiff must show these two elements of state action in order to hold Amboy to the provisions of Section 1983.

Although plaintiff cites precisely this language from *Lugar,* (Plaintiff's Memorandum in Opposition at 9–10), he then argues: " 'A rule of conduct imposed by' the Board, namely, that only certified drivers could work for Amboy caused Amboy to fire Hill. Thus, Amboy's act constituted state action." (*Id.*) This argument is deficient in two respects. First, plaintiff nowhere indicates how this termination is relevant to a cause of action questioning the adequacy of the process plaintiff received at his OPT hearing. Plaintiff has not alleged that defendant Amboy acted pursuant to a state rule of conduct with respect to this hearing; he has not shown that Amboy was in any way responsible for the alleged inadequacies of process to which he was subjected. He has thus failed to demonstrate the first element of the *Lugar* state-action test.

Second, plaintiff has not shown that the persons at Amboy were state officials, that they acted together with state officials or obtained significant aid from state officials, or that their conduct is otherwise chargeable to the state. Even though simply showing a *conspiracy* to deprive plaintiff of due process between Amboy personnel and Board officials would establish this aspect of the state-action test, *Lugar,* 457 U.S. at 931, 102 S.Ct. at 2750, plaintiff has made no showing of any concerted acts, cooperation, or even an agreement of this kind. The only interaction between Amboy personnel and Board personnel to which plaintiff points is that an officer of Amboy, Michael Gatto, attended the decertification hearing and answered several questions from the OPT panel members. (See Plaintiff's Memorandum in Opposition at 18) But plaintiff does not assert even a colorable argument that Gatto's attendance and "testimony" contributed to any denial of due process. In short, plaintiff has shown absolutely no connection between the alleged deprivation of his fourteenth amendment rights and the acts of defendant Amboy.

Plaintiff appears to predicate Amboy's state-actor status entirely on the opinion of the district court in *Stein v. Board of Education,* CV–82–4117, slip op. (E.D.N.Y. Mar. 19, 1984). There, Judge Nickerson held that A.C.J., a private bus company, was a "state actor" for the purposes of the Section 1983 claim of a plaintiff who alleged that he had been decertified by the Board of Education and subsequently discharged by A.C.J. without due process of law. Judge Nickerson observed:

A.C.J.'s decision to discharge plaintiff was the direct result of, indeed, was compelled by, a governmental action.... The joint participation here of the Board and A.C.J. in allegedly depriving plaintiff of a property right without due process of law is sufficient to hold A.C.J. [liable under Section 1983.]

*Id.* at 7. However, the plaintiff in *Stein* had made a showing of complicity by bus company personnel in the alleged deprivations of due process. In that case, the president of the bus company initiated the decertification procedure by informing the Board of Education of certain complaints against the plaintiff. *Id.* at 2–3. More importantly, the plaintiff in *Stein*—who predicated his Section 1983 action on the inadequacy of the notice given to him of the hearing as well as on the manner in which the hearing was conducted—had been given his *only* notification of his decertification hearing by an employee of the private bus company. *Id.* at 3. As Judge Nickerson recounted the relevant facts: "[The] plaintiff was told by an A.C.J. employee to go to the Bureau offices on April 12. He was given no further notice, oral or written, of the matters to be discussed." *Id.*

Thus, the defendant bus company in *Stein* had clearly acted in concert with Board of Education officials on the matters concerning the process provided to that plaintiff. By contrast, plaintiff in this case was advised of his decertification hearing by the Board of Education itself. (Exh. "O" of Defendant Board at 1) And although plaintiff attacks that notice, he has not demonstrated that Amboy played any role in the inadequacy of that notice or in the inadequacy of the other procedural matters at his hearing. Hence, *Stein* is inapposite. Plaintiff, then, has failed to demonstrate any way in which defendant Amboy contributed to his alleged denial of due process; he has not shown any act by Amboy personnel that supports his second cause of action under Section 1983. For this reason, the court must grant summary judgment to Amboy on plaintiff's second claim for relief.

Similarly, as to his fourth cause of action, plaintiff has failed to demonstrate that his termination by Amboy was state action within the purview of Section 1983. Again, plaintiff must meet both prongs of the *Lugar* test: that Amboy acted pursuant to a rule of conduct imposed by the state and that the employees of Amboy may fairly be said to act on behalf of the state. Plaintiff has not adduced any evidence that Amboy's decision to terminate him after his decertification was an action taken pursuant to a state rule of conduct. No ordinance or regulation of the Board required Amboy to terminate plaintiff after his decertification; the Board simply prohibited Amboy from permitting plaintiff to operate a bus on Board of Education bus routes. Further, plaintiff has not shown that Amboy personnel are state officials, that they acted together with state officials, or that their conduct is otherwise chargeable to the state. As noted, Amboy has vigorously denied that its personnel had any interactions with the employees of the Board of Education as to plaintiff's case, (Defendant Amboy's Rule 3(g) Statement in Opposition ¶ 8); and plaintiff has not produced *any* evidence to controvert this assertion of fact. Thus, plaintiff has not demonstrated that there is a genuine issue of fact as to whether his termination by Amboy was conduct that, in any manner, may be "fairly attributable to the State." For this reason, plaintiff's fourth cause of action must be dismissed as against Amboy insofar as it sets forth a claim for relief under Section 1983.

## IV. THE CONSPIRACY CLAIMS: DEFENDANTS BOARD AND AMBOY

In his third and fifth claims, plaintiff alleges that the Board and Amboy conspired to deprive him of his civil rights in violation of 42 U.S.C. § 1985(3). That section provides, in relevant part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws

> ... the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Here, plaintiff argues that defendants conspired to commit the violations of his civil rights that form the bases for the second and the fourth causes of action—that defendants conspired to deny him due process of law at his decertification hearing in violation of Section 1983 and that they conspired to decertify and discharge him in violation of Section 1981.

In order to defeat defendants' motions for summary judgment on his third and fifth causes of action, plaintiff cannot rest with the allegations of conspiracy set forth in his complaint. Rather, he must demonstrate particular overt acts of defendants that were reasonably related to promoting conspiracy. *Cf. Powell v. Workmen's Compensation Board,* 327 F.2d 131, 137 (2d Cir.1964) ("[P]laintiff was bound to do more than merely state vague and conclusionary allegations respecting the existence of a conspiracy. It was incumbent upon him to allege with at least some degree of particularity overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy."). In short, plaintiff must adduce evidence of the claimed conspiracy that is "significantly probative" and is more than "merely colorable." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2511.

First, as noted above, defendant Amboy contends as a fact not in issue that: "Prior to and after [the hearing held by Amboy], Amboy had no conversations or discussion with any Board of Education or OPT official regarding the charges against Hill and the escorts." (Defendant Amboy's Rule 3(g) Statement in Support ¶ 19) Plaintiff does not controvert this statement. Rather, he simply restates the conclusory allegation of his complaint: "Following either express or tacit agreement, the Board and Amboy acted in concert and thus conspired to discharge plaintiff from his position as a school bus driver." (Plaintiff's Rule 3(g) Statement in Opposition ¶ 10) As a threshold matter, then, plaintiff does not dispute defendant Amboy's assertion that there was no discussion between employees of the two defendants regarding "the charges against Hill and the escorts." Thus, plaintiff must necessarily adduce other evidence of the alleged conspiracies.

To this end, plaintiff offers the following facts as evidence probative of the civil-rights conspiracies charged in the complaint: First, "the contract between Amboy and the Board did not allow Amboy to employ drivers on Board routes after a determination by the Board that a driver's competency fell below acceptable standards"; second, "[o]nce the Board made such a determination, Amboy discharged Hill"; third, "Mr. Michael Gatto, an employee of Amboy, attended the Board's June 1985 and October 1985 conferences and Mr. Gatto was actually a witness at the June hearing"; fourth, "the conferences were held on Amboy's premises"; fifth, "the Board's initial investigation took place on Amboy's premises"; and sixth, "[there was] disparate treatment by both the Board and Amboy of the Plaintiff and the two matrons." (Plaintiff's Memorandum in Opposition at 17–18)

None of these facts, however, is even remotely probative of a "conspiracy" between the Board and Amboy. First, plaintiff does not suggest how the contract provision that prohibited use by Amboy of non-certified bus drivers on school bus routes evidences an agreement between defendants to subject this plaintiff to a denial of his constitutional rights. Indeed, plaintiff does not contest that this contract provision was in effect before plaintiff was hired by Amboy or certified by the Board. As such, it is entirely irrelevant to the conspiracy inquiry. Second, the fact that Amboy discharged plaintiff after he was decertified by the Board demonstrates nothing more than compliance by Amboy with this general contract provision. Viewed against the background of the prohibition against continued employment of plaintiff on school bus routes, the discharge by Amboy after decertification by the Board is not probative of a conspiratorial undertaking by defendants.

Third, Gatto's presence at the hearing does not suggest a conspiracy but rather indicates that Gatto possessed information relevant to the matters under scrutiny at the hearing. Fourth, the decertification hearing was held on the premises of Amboy pursuant to a provision of the contract between Amboy and the union of which plaintiff was a member. Fifth, that the Board conducted an "initial investigation" on the premises of Amboy simply reveals that the Board began an inquiry into the events of May 13, 1985 on the day that the offensive conduct was reported; not surprisingly, the Board determined that the best place to begin its "investigation" was by interviewing plaintiff himself—and he, of course, was found most easily on the premises of his employer. And sixth, the "disparate treatment by both the Board and Amboy of the Plaintiff and the two matrons" does not suggest a conspiracy; rather, it demonstrates again that Amboy discharged plaintiff because he had been decertified and was therefore prohibited from working on school bus routes. As such, he was of no use to Amboy. The matrons, on the other hand, were not decertified and therefore continued to be employable by Amboy. In short, these six facts to which plaintiff refers as evidence of insidious civil-rights conspiracies represent nothing more than wholly legitimate and proper actions undertaken by defendants not pursuant to an agreement between them to violate the plaintiff's civil rights but pursuant to their pre-existing contract. Because plaintiff has produced no significantly probative evidence of the alleged civil-rights conspiracies, the motions by both defendants for summary judgment on the third and fifth causes of action are hereby granted.

## V. SECTION 1981: DEFENDANT AMBOY

As mentioned above, plaintiff's fourth cause of action alleges that defendant Amboy intentionally discriminated against plaintiff by terminating him in violation of 42 U.S.C. § 1981. The law surrounding this statute has a muddled history. Up until 1989, the Second Circuit interpreted Section 1981 as prohibiting discriminatory contract termination. *See Gonzalez v. Home Ins. Co.*, 909 F.2d 716, 722 (2d Cir.1990) (citing cases); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989). However, the Supreme Court—in *Patterson v. McLean Credit Union*, 491 U.S. 164, 171, 109 S.Ct. 2363, 2369, 105 L.Ed.2d 132 (1989)—limited Section 1981's coverage to discrimination occurring at the contract formation or enforcement stage of a relationship; as such, the Court refused to recognize complaints resting solely on allegations of discrimination occurring after a contract relation has been established, including breach of a contract's terms or conditions. *Id.* at 177, 109 S.Ct. at 2373. Since plaintiff's claim relates solely to his discharge and not his hiring, under the *Patterson* regime that claim fails as a matter of law.

Section 101(b) of the 1991 Civil Rights Act ("1991 Act" or the "Act") added a new provision to Section 1981:

> the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

Clearly, if the new statutory language applies to defendant Amboy's conduct, plaintiff may state a cause of action under Section 1981 sufficient to bar a grant of summary judgment. Thus, this court must determine whether Section 101(b) should apply retroactively to conduct that predates the 1991 Act.

The retroactivity of this and other sections of the 1991 Civil Rights Act has been the subject of much debate. Almost all of the Circuit courts to pass on this question have found the Act prospective only. *See, e.g., Baynes v. AT & T Technologies, Inc.*, 976 F.2d 1370, 1373–74 (11th Cir.1992); *Gersman v. Group Health Assoc., Inc.*, 975 F.2d 886, 900 (D.C.Cir.1992); *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 229 (7th Cir.), *reh, en banc, denied*, (1992); *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1373–74 (5th Cir.1992); *Mozee v. American Commercial Marine Ser-*

*vice Co.*, 963 F.2d 929 (7th Cir), *cert. denied*, — U.S. —, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992); *Fray v. Omaha World Herald Co.*, 960 F.2d 1370, 1377 (8th Cir. 1992); *Vogel v. Cincinnati*, 959 F.2d 594, 598 (6th Cir.1992). The sole exception is the Ninth Circuit which applied retroactively the portion of the statute governing expert witness fees. *Davis v. City and County of San Francisco*, 976 F.2d 1536 (9th Cir.1992).

The Second Circuit has not yet given an opinion on the 1991 Act's retroactivity. *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181–82 (2d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1048 (2d Cir.1992). However, several courts in this district have done so to different conclusions. *Compare Smith v. Petra Cablevision Corp.*, 793 F.Supp. 417, 431 (E.D.N.Y.1992) (Amon, J.) (finding no retroactivity as to Section 101(b)) *with Croce v. V.I.P. Real Estate, Inc.*, 786 F.Supp. 1141, 1150 (E.D.N.Y.1992) (Spatt, J.) (finding retroactivity with respect to availability of jury trial and compensatory damages); *see also Bridges v. Eastman Kodak Co.*, 800 F.Supp. 1172, 1174 (S.D.N.Y.1992) (listing district court cases within Second Circuit reaching divergent conclusions); *cf. Youssef v. M. Rosenblatt & Son, Inc.*, 1992 WL 116633, 1992 U.S. Dist. LEXIS 6692, * (S.D.N.Y.1992) (denying motion to dismiss jury trial request without prejudice to renew and granting plaintiff's motion to amend with leave to strike pending appellate guidance on retroactivity of 1991 Act). Bearing this extensive procedural background in mind, this court will conduct a brief review of the factors that have emerged as important to deciding the retroactivity question before honing in on the Act's application to pre-*Patterson* conduct.

It is axiomatic that when interpreting statutes, a court must start by looking to "the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, the language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The ambiguity inherent in much statutory language renders this admonishment far more difficult than it initially would appear. Almost clairvoyant of the problems posed by the 1991 Civil Rights Act is Justice Frankfurter's statement that "[i]n matters of statutory construction [ ] it makes a great deal of difference whether you start with an answer or with a problem." Hon. Felix Frankfurter, *Some Reflections on the Reading of Statutes*, Sixth Annual Benjamin N. Cardozo Lecture delivered before the Association of the Bar of the City of New York, March 18, 1947 (*reprinted in* 47 Colum.L.Rev. 527, 529 (1947)). As Justice Frankfurter further explained:

> Though we may not end with the words in construing a disputed statute, one certainly begins there. You have a right to think that a hoary platitude, but it is a platitude not acted upon in many arguments. In any event, it may not take you to the end of the road. The Court no doubt must listen to the voice of Congress. But often Congress cannot be heard clearly because its speech is muffled. Even when it has spoken, it is as true of Congress as of others that what is said is what the listener hears. Like others, judges too listen with what psychologists used to call the apperception mass, which I take it means in plain English that one listens with what is already in one's head.

*Id.* at 535–36. Judge Posner vividly echoed these sentiments in *Friedrich v. Chicago*, 888 F.2d 511, 514 (7th Cir.1989), *vacated*, — U.S. —, 111 S.Ct. 1383, 113 L.Ed.2d 440 (1991):

> [J]udges realize in their heart of hearts that the superficial clarity to which they are referring when they call the meaning of a statute "plain" is treacherous footing for interpretation. They know that statutes are purposive utterances and that language is a slippery medium in which to encode a purpose.... When a court can figure out what Congress probably was driving at and how its goal can be achieved, it is not usurpation—it is interpretation in a sense that has been

orthodox since Aristotle—for the court to complete (not enlarge) the statute by reading it to bring about the end that the legislators would have specified had they thought about it more clearly or used a more perspicuous form of words.

Not surprisingly, courts that have considered the 1991 Civil Rights Act's retroactivity—both those cited above and others—look first to the statute's language, then to its legislative history, and finally to governing Supreme Court precedent. And as the quotations and this court's reference to them intimate, few courts have found either the words or the legislative history of the 1991 Act determinative. *See, e.g., Johnson,* 965 F.2d at 1372 ("The statutory language and legislative history is inconclusive on the question of retroactive application."); *Petra Cablevision,* 793 F.Supp. at 421 ("Most courts, however, have acknowledged, even where ultimately applying the Act retroactively, that the language of the statute is less than clear and that it is possible to read the language as supporting prospective, as well as retrospective application.").

Turning first to the Act's language, litigants have relied on Sections 109 and 402(b), both of which are expressly prospective, to argue that the remainder of the Act is retrospective. However, as most courts have agreed, it is just as likely that Congress intended the language of these two sections as specific insurance of prospective application without imposing any effect on the statute's remainder. *See Gersman,* 975 F.2d at 890 ("[G]iven the convoluted legislative history of this Act and the war of interests firing at each other across the floor of both legislative houses, one might view these two subsections not as redundancies, but rather as insurance policies."); *Fray,* 960 F.2d at 1377 ("[W]henever a congressional majority could be marshalled, retroactivity opponents 'hedged their bets' by expressly making specific provisions, such as [Section 109], prospective only."); *Petra Cablevision,* 793 F.Supp. at 421 ("[I]t is logical to conclude that Congress simply sought to insure that no matter what happened to the rest of the Act, *Wards Cove* would be immune."). Certainly, the language is anything but clear. *But see Davis,* 976 F.2d at 1550–56 (discussing prospective language of Sections 109 and 402(b) as indicating retroactive application of statute's remainder and comparing cases that held otherwise). Similarly, Section 402(a)'s directive—that the Act shall take effect on November 21, 1991—does not indicate that as of that date all courts considering conduct under the statute's auspices are to apply the statute to the behavior before them. *See Mozee,* 963 F.2d at 933 ("Section 402(a)'s language is hopelessly ambiguous as to the issue of whether Congress intended the 1991 Civil Rights Act to apply retroactively to pending cases.").

Since the statute's language does not answer the retroactivity question, courts have looked to its legislative history. However, there are no legislative committee reports that explain the 1991 Act. *Fray,* 960 F.2d at 1376. And the floor debates represent highly politicized views of individual Congress members. *Id.* at 1376–77; *Davis,* 976 F.2d at 1553 & n. 9; *see also Croce,* 786 F.Supp. at 1144 ("Upon review of excerpts from the Act's legislative history, it is clear that the colloquy concerning retroactivity split along partisan lines."). Thus, "the contenders could not agree, so they dumped the question into the judiciary's lap without guidance." *Luddington,* 966 F.2d at 227 (Posner, J.).

Given the lack of guidance from Congress, courts have turned to Supreme Court precedent discussing retroactivity of statutory provisions. And, as many others already have acknowledged, the cases are "irreconcilably" conflicted. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 841, 110 S.Ct. 1570, 1578, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring) ("In the rules of construction that they announce, if not in the results they produce, these two lines of cases are not merely as the Court confesses, in 'apparent tension,' ... they are in irreconcilable contradiction, and have spawned Courts of Appeals opinions to match."); *Gersman,* 975 F.2d at 892–96 (detailing history and precedent leading up to adoption of opposing

retroactivity presumptions). The two Supreme Court cases that announce apparently polar rules of law regarding retroactivity are *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.") and *Bradley v. School Bd. of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974) ("[A] court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary."). *See also Kaiser Aluminum*, 494 U.S. at 840–58, 110 S.Ct. at 1578–88 (Scalia, J., concurring) (discussing the *Bowen/Bradley* conflict and advocating express overruling of *Bradley*).

To date, however, the Supreme Court has not reconciled the tension between the laws of *Bowen* and *Bradley*. As a result, lower courts have struggled with how to understand and work within this conflict; with respect to the 1991 Act and especially Section 101(b), courts have navigated these conflicting cases by relying on *Bennett v. New Jersey*, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985). *See, e.g., Gersman*, 975 F.2d at 897–98. In *Bennett*, a case centering around the misuse of certain federal fund grants, the Supreme Court refused to apply a statute retroactively because "substantive rights" were involved. *Bennett*, 470 U.S. at 639, 105 S.Ct. at 1560. Distinguishing *Bradley*, the Court explained that "statutes affecting substantive rights and liabilities are presumed to have only prospective effect." *Id.* The Court also emphasized the practical implication of its holding: the necessity that parties be able to adjust their conduct to the governing standards in place when that conduct occurred. *Id.* at 640, 105 S.Ct. at 1560.

> As several courts have recognized, Section 101 affects substantive antecedent rights. Under *Patterson*, § 1981 did not prohibit discrimination in promotions [or terminations] before the enactment of § 101. Section 101 extended § 1981 to such discriminatory conduct. We then presume that § 101 does not apply to conduct that occurred before its enactment, absent clear evidence to the contrary. There is no such clear evidence.

*Johnson*, 965 F.2d at 1374. From this recognition, these courts have reasoned that parties—employers in Section 1981 cases—should not be punished for engaging in conduct—here discriminatory termination—that was permissible at the time that the conduct occurred. *See Gersman*, 975 F.2d at 897–98; *Mozee*, 963 F.2d at 936 ("[O]ne of the policies embodied in the need for prospective application is that it is unfair to hold private parties accountable for rules which were not in effect at the time in which the parties' relevant conduct took place.... As such, the better and more fair rule is to hold parties accountable for only those acts that were in violation of the law at the time the acts were performed."); *see also Baynes*, 976 F.2d at 1372–73 (applying both *Bowen* and *Bradley* presumptions to conclude that Section 101 should be prospective only); *Fray*, 960 F.2d at 1378 (same). This court joins the majority of its sister courts and therefore declines to apply Section 101(b) of the 1991 Civil Rights Act to conduct that occurred when *Patterson* was the governing law.[7]

7. The Second Circuit has acknowledged the tension between *Bowen* and *Bradley*. *See Morgan Guaranty Trust Co. v. Republic of Palau*, 971 F.2d 917, 921 (2d Cir.1992) ("The Supreme Court's current position on retroactive application of civil statutes is, as the Court itself has acknowledged, somewhat unclear."). However, this circuit has neither attempted to reconcile these two opposing rules nor clearly advocated one presumption above the other. For example, in *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 874 (2d Cir.1992), the court referred in dicta to *Bradley* but did not address the retroactivity issue since it found a collateral estoppel argument determinative. *See also United States v. Colon*, 961 F.2d 41, 45 (2d Cir.1992) (applying *Bradley*'s "law-in-effect canon" to change in sentencing guidelines). However, in *Lehman v. Burnley*, 866 F.2d 33, 35 (2d Cir.1989), the court—faced with determining the meaning of certain language in the Recreational Boating Safety Act, 46 U.S.C. § 13103(a)—relied on *Bowen* to hold that the Secretary of Transportation's interpretation should not apply retroactively. *See also Petra Cablevision*, 793 F.Supp. at 430 &

This holding does not end the inquiry, however, since in this case the conduct for which plaintiff seeks to recover occurred prior to the *Patterson* decision. At the time that Amboy terminated Hill's employment, the Second Circuit interpreted Section 1981 as extending to job discrimination occurring after contract formation. *See Gonzalez,* 909 F.2d at 722. As such, plaintiff argues that the only sensible course for this court to take is to apply Section 101(b) to Amboy's conduct; to do otherwise, plaintiff asserts, would take conduct that fell within Section 1981 when it occurred and now once again falls within the statute's purview and would place that conduct beyond the reach of the Civil Rights Act by virtue of a rule in effect—via *Patterson*—for only two years.

Several other courts have addressed the retroactivity question in the context of pre-*Patterson* conduct. For example, just months after the *Mozee* decision was handed down, a different panel of the Seventh Circuit faced the specific question of how the 1991 Act should apply to behavior that occurred prior to *Patterson. See Luddington,* 966 F.2d at 229. Rather than relying on the language of *Mozee* quoted above, the court discussed the theoretical and practical drawbacks that would result from its excepting this narrow category of cases from prospective application:

> The pre-*Patterson* "legal regime" to which we have referred was merely a set of lower-court decisions, constituting a stab in the dark concerning issues on which the Supreme Court had not yet ruled. It was a tentative regime, which *Patterson* swept away. And it would be a considerable paradox to hold that the older the conduct complained of, the more securely the conduct is subject to the new statute. The Civil Rights Act of 1991 would be applied to racial discrimination committed before 1989, as well as to that committed since 1991, but racial discrimination committed between 1989 and 1991 would be subject to the more liberal (from a defendant's standpoint) regime of the *Patterson* decision. A jurisprudence of effective dates for the 1991 statute would be too complex to be worth elaborating and applying, especially when we consider the added costs of litigation that would be imposed.

*Id.* Similarly, in *Johnson,* 965 F.2d at 1374, the Fifth Circuit stated:

> We recognize the apparent anomaly that, at the time of [the] allegedly discriminatory conduct, *Patterson* had not yet been decided and, under the decisions of many lower courts, § 1981 applied to racial discrimination in promotions. [Defendant's] reliance on the law announced in *Patterson,* therefore, may be minimal.... We are not persuaded. As a matter of law the rule announced in *Patterson* applies retroactively.... [Defendant] is just as entitled to the preservation of its substantive interests under this rule as litigants whose conduct occurred after *Patterson* was decided. Any other holding would require unwieldy distinctions between classes of litigants based on the degree to which they relied on the legal regime antedating the Civil Rights Act of 1991. We decline to embark on such an inquiry.

n. 13 (explaining that Second Circuit reliance on *Bradley* pre-dated *Bowen*).

Finally, in *Leake v. Long Island Jewish Medical Center,* 695 F.Supp. 1414 (E.D.N.Y.1988), *aff'd,* 869 F.2d 130, 131 (2d Cir.1989) (per curiam), Judge Platt faced the question of whether the Civil Rights Restoration Act of 1987 applied retroactively despite the absence of "any intent of Congress for retroactive application." *Id.* at 1416 (citing *Bradley* and *Bennett*). He held that terms in the statute such as "restore" and "clarify" indicated that Congress "intended to reject the Supreme Court's interpretation" of a provision amended by the new statute. *Id.* at 1417. Relying on *Mrs. W. v. Tirozzi,* 832 F.2d 748, 755 (2d Cir.1987), the *Leake* court stated that since the statute's language announced Congress's intent to overrule Supreme Court precedent, Congress *must* have intended the law to apply retroactively. However, as Judge Amon pointed out in *Petra Cablevision,* the legislative history in *Leake*—essentially absent in this case—drove that decision. *Petra Cablevision,* 793 F.Supp. at 430 n. 13. *But cf. McLaughlin v. New York, Governor's Office of Employee Relations,* 784 F.Supp. 961, 972–73 (N.D.N.Y.1992) (acknowledging that some New York courts apply restorative legislation retroactively but distinguishing the 1991 Act's Title VII damages provisions since those provisions "were not promulgated in response to a Supreme Court decision.").

*See also Gersman,* 975 F.2d at 899–900 ("The fact, stressed by the dissent, that the conduct involved here occurred before the decision in *Patterson* is of no legal effect. It simply cannot be the law that retroactive application of a statute is governed by whether or not the parties reasonably, but mistakenly, believed that the law at the time of their conduct was what the law later became.").

In her *Gersman* dissent Judge Wald forcefully propounds the opposing argument; she argues that rather than distinguishing between substance and procedure, *Bennett* instructs courts to focus on parties' expectations at the time of their conduct. *Id.* at 900–15 (Wald, J., dissenting) ("Because the law prior to the Supreme Court's decision in *Patterson* ... with respect to § 1981's applicability to post-formation conduct was substantially identical to the law as enacted in § 101 of the Civil Rights Act, the retroactive application of that section to the parties in this case would not undermine the parties' reasonable expectations concerning the rights and obligations arising out of their conduct in October 1987."). She therefore concludes that parties who engaged in discrimination after contract formation reasonably expected that their conduct would be actionable and therefore should be held accountable for that conduct. *Id.* at 907 ("To the extent that the law prior to *Patterson* was the same as the law enacted in the Civil Rights Act, the application of § 101 of the Act to the facts of this case would not be 'manifestly unjust,' and the *Bradley* presumption should govern. Because the new law was the same as what the parties reasonably understood the law to be before *Patterson,* there is no reason not to apply § 101 retroactively.").

Admittedly, neither of the two alternatives with which this court is faced is optimal: one protects conduct that was impermissible when it occurred merely because a Supreme Court case announced a rule that Congress soon rejected; the second alternative slivers out and protects a two-year period of post-contract formation discrimination but makes the exact same conduct outside the relevant window of time actionable. Forced to choose between these alternatives, this court finds the former more coherent and therefore more palatable. As *Luddington* and *Johnson* recognized, singling out pre-*Patterson* conduct for retroactive application not only would incur practical difficulties, but also would ignore the well entrenched rule that Supreme Court cases should be applied retroactively. *James B. Beam Distilling Co. v. Georgia,* — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). In addition, differentiating between pre- and post-*Patterson* conduct would sacrifice the finality and stability that Supreme Court cases and statutes bring—or should bring—to the law. While Section 1981 has experienced a tortuous history, differentiating pre-*Patterson* conduct will only further confuse the statute's scope and application. Absent Congressional or appellate court guidance, this court refuses to take such a step. Accordingly, plaintiff Hill's Section 1981 claims fail as a matter of law, causing this court to grant summary judgment to defendant Amboy on plaintiff's fourth cause of action.

## CONCLUSION

This court hereby denies all motions for summary judgment on plaintiff's Title VII action. As to all other causes of action, this court grants summary judgment in favor of defendants.

SO ORDERED.